IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                               :
JEFFREY HARLEY,                :       HON. JEROME B. SIMANDLE
                               :
          Plaintiff,           :       Civil No. 07-3559 (JBS/JS)
                               :
     v.                        :
                               :                OPINION
TIMOTHY GEITHNER,              :
                               :
          Defendant.           :
_____:
```

Michelle J. Douglass, Esq.
THE DOUGLASS LAW FIRM, L.L.C.
1601 Tilton Road
Suite 6
Northfield, NJ 08225
     Counsel for Plaintiff Jeffrey Harley

Daniel Shay Kirschbaum, Assistant U.S. Attorney
OFFICE OF THE UNITED STATES ATTORNEY
970 Broad Street
Newark, NJ 07102
     Counsel for Defendant Timothy Geithner

**SIMANDLE**, District Judge:

     This matter comes before the Court on Defendant's[1] motion

for summary judgment.  [Docket Item 54.]  Plaintiff's remaining

claims against Defendant are brought under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2, et seq. ("Title VII").

He alleges that his supervisors and others at the IRS

_____

     [1] Plaintiff originally filed suit against Henry M. Paulson,
Jr., as United States Secretary of the Treasury in his official
capacity.  In the time since this Court's last opinion on
December 9, 2008 [Docket Item 19], Mr. Paulson has left office
and has been replaced by Timothy Geithner.  Pursuant to Fed. R.
Civ. P. 25(d), the Court has automatically substituted Mr.
Geithner as the named defendant in this action.

discriminated against him because of his race, he is African-
American, and retaliated against him for bringing a previous
civil suit along with several other complaints to the Equal
Employment Opportunity Commission ("EEOC").  Because the
Plaintiff fails to point to sufficient evidence in the record
supporting a prima facie case for any of his various claims, the
Court will grant Defendant's motion for summary judgment.

**I.   BACKGROUND**

This case has a lengthy factual and procedural background.
Plaintiff has worked for the New Jersey branch of the IRS
(officially known as the Newark Field Office) in the Criminal
Investigation Division ("CI") for approximately 30 years, and
has, in that time, filed three separate complaints with this
Federal District Court alleging discrimination and retaliation in
violation of Title VII.  See Harley v. Bentsen, Civil No. 94-749,
slip op. (D.N.J. Oct. 28, 1996) and Harley v. Rubin, Civil No.
97-4082, slip op. (D.N.J. Aug. 12, 1998).  The present action
picks up where the first lawsuit ended, and covers some of the
same ground as the second suit.  Plaintiff claims that, since the
settlement of his first suit in 1996, Defendant has continuously
retaliated and discriminated against him by delaying his eventual
promotion to a higher rank, by giving him annual reviews which
were lower than he believes he deserved, and though a series of

disagreements over leave, credit hours, transit reimbursement, workers compensation, and assignment of duty posts. This current action is based on a series of six EEO complaints that Plaintiff filed between November of 2002 and October of 2006.

    A.    <u>Factual History</u>[2]

        **1. Original Lawsuit and Settlement**

In 1994, Plaintiff filed his first federal suit (<u>Harley v. Bentsen</u>, Civil No. 94-749) against Defendant, alleging, <u>inter alia</u>, that Defendant had discriminated against him by denying him promotions because of a supervisor's discriminatory animus. (Harley Aff. at ¶ 3.) In August of 1996, Plaintiff accepted a settlement offered by Defendant in which Defendant awarded Plaintiff sum of money and a promotion to an Investigative Analyst ("IA") position at a rank of GS-11 at the Cherry Hill, New Jersey, post of duty. (Oct. 1, 1996 Report & Rec. at 11.) After accepting the offer on the record in the final settlement

---

[2] The Court has endeavored to set forth the uncontested facts in the record underlying Plaintiff's claims noting those places where material disputes of fact exist. Its capacity to do so was not facilitated by Plaintiff's L. Civ. R. 56.1 statement, which, over the course of 136 pages and 354 paragraphs, cites to "Exhibit A" (Plaintiff's Affidavit) approximately 266 times without providing paragraph or page references. <u>See</u> <u>McKinnon v. Gonzales</u>, 642 F. Supp. 2d 410, 416 n.1 (D.N.J. 2009) (noting that when party's 56.1 statement is disorganized and unclear, "it hampers the process of reviewing the record and materials submitted, and any complaint that some piece of evidence was overlooked, for example in a motion for reconsideration, is correspondingly attenuated") (internal quotations omitted).

conference, Plaintiff attempted to reject the settlement terms and sought, <u>inter</u> <u>alia</u>, a different post of duty at Mays Landing. (<u>Id.</u>)  Defendant moved to enforce the settlement; this Court concluded that the original settlement offer was enforceable because it was a "full, fair, and voluntary settlement agreement" and granted Defendant's motion, terminating the case. (Oct. 28, 1996 Order Enforcing Settlement Agreement at 2).

### 2.  Second Lawsuit

In November of 1996, Plaintiff began working at his new job in Cherry Hill, and shortly thereafter discovered that his SF-50 form, a standard document that is created for every employment action in federal agencies, contained a remark stating that his new position of GS-11 IA had "no promotion potential" and stated that he had been promoted as part of a district court settlement. (Ex. C to Pl.'s Opp'n to Mot. Summ. J.) (<u>See also</u> 1997 Compl. attached as Ex. T1 to Pl.'s Opp'n to Mot. Summ. J.)  Plaintiff alleges in his affidavit that he later learned it was Paul Machalek, a manager in the Newark Field Office in the 1990s, who inserted this language in Plaintiff's SF-50 remarks field. (Harley Aff. ¶ 6.)  In August of 1997, Plaintiff again filed suit in this Court, claiming that this restriction on further promotion in his SF-50 form was an act of retaliation in violation of Title VII.  In August of 1998, this Court granted Defendant's motion to dismiss this action, holding that the

4

language limiting the position's further promotion on Plaintiff's SF-50 form was not retaliation under Title VII because it was not an adverse employment action cognizable under Title VII.  Harley v. Rubin, No. Civil 97-4082, slip op. at 9-10 (D.N.J. Aug. 12, 1998).  This Court further held that any other claim of failure to promote that Plaintiff might allege was not yet ripe, as he had not yet applied for any promotion and been rejected, as required under Title VII. (Id. at 10.)

### 3. Hostility in Cherry Hill

In the two years following Plaintiff's assignment as a GS-11 IA in Cherry Hill, from 1996 to 1998, he allegedly experienced hostility from some co-workers in the office, including being "stared down" or "glared at" in an "intimidating manner." (EEO Compl. 03-3040 at 2, attached at Pl.'s Br. in Opp'n at 9.) Plaintiff attributed this hostility to resentment in the office against Plaintiff for his 1994 law suit and settlement. (Id.) Plaintiff reports that his complaints about the hostility in the office went unheeded (id.), but the Court notes that Plaintiff adduces evidence that IRS management assigned Plaintiff a "coach" to help him more easily fit into the office and prevent such hostility from getting worse. (Pl.'s R. 56.1 stmnt. ¶ 20); (Schmus Decl., Ex. E to Pl.'s Br. Opp'n.)  In 1998, the hostility in the Cherry Hill post of duty ceased with the retirement of one particular employee. (EEO Compl. 03-3040 at 2.)

### 4.   Plaintiff's 2002 Performance Evaluation

Approximately four years later, in July of 2002, Plaintiff's then-supervisor, Leo Blanes presented Plaintiff with his annual performance evaluation.  (Blanes Decl. ¶ 9); (Harley Aff. ¶ 29.) The review was the highest score Plaintiff had received in the nearly six years that he had been working as an IA, with an overall rating of "exceeds fully successful" and a numerical score of 4.0 out of a possible 5.  (Blanes Decl. Ex. A.); (Harley Aff. ¶ 31.)  Plaintiff believed that he deserved a higher score, and expressed his dissatisfaction to Blanes in a series of e-mail messages to which Blanes responded with an explanation for his review.  (Harley Aff. ¶¶ 32-34.)  In Plaintiff's final rebuttal to his review, he requested that he no longer be required to provide certain written summaries of his work to Blanes because he believed Blanes no longer read them, and indicated that he thought Blanes was racially discriminating against him.  He indicated that he intended to file an EEO complaint on the issue. Blanes forwarded the e-mail exchange to his superiors in the field office headquarters asking for guidance and stating that he felt that the tone of Plaintiff's e-mails and his request to cease sending work summaries were "insubordinate." (Ex. I to Pl.'s Opp'n.)

During the course of this exchange, Plaintiff and Blanes compared Plaintiff's performance with that of the only other GS-

11 ranked IA in the state at the time, a white female named
Carolyn Asfalg.  (Harley Aff. ¶ 32.)  Plaintiff claimed that
Blanes was showing her favoritism through a more lenient
evaluation standard. (Id.)  Blanes rated Plaintiff higher than
Asfalg in the 2002 evaluations.  (Id. at ¶ 30.)

###    5.    Blanes's Denial of POV and Overtime Requests

In September of 2002, Blanes denied Plaintiff's request for
reimbursement for using his personal vehicle ("POV") for work-
related activities apparently on one occasion. (Blanes Decl. ¶¶
22-32.)  Blanes believed that he was under budgetary pressures
leading up to the end of the fiscal year on September 30, during
which time he claims to have asked all of his employees to limit
their use of POVs. (Blanes Decl. ¶¶ 24-26.)  He continued to
approve limited reimbursement for POV use for high-priority
assignments, but the one time he denied Plaintiff's request, he
did not believe it to be high-priority use.  (Blanes Decl. ¶ 30.)
Plaintiff denies receiving any e-mail from Blanes or seeing any
office-wide memoranda on the topic, and introduces testimony from
a different supervisor in a different post of duty who claimed to
be unaware of any travel funds shortage at the time. (Harley Aff.
¶ 48); (Pl.'s R. 56.1 stmnt. ¶ 56.)

Plaintiff subsequently filed EEO Complaint 03-3040 on
November 25, 2002, where he alleged that his July 2002 evaluation
was unfairly low due to racial discrimination and retaliation for

7

his prior civil lawsuits in the late 1990s.  (EEO Compl. 03-
3040.)  He further claimed that Blanes's denial of reimbursement
funds for POV use in September was in retaliation for his August
threat to file an EEO complaint. (Id.)

In December of 2002, Plaintiff requested overtime "credit
hours" from Blanes to complete a project prior to January 1,
2003.  Blanes responded by denying the request and instead
suggested that Plaintiff just complete as much of the assignment
prior to the deadline as possible. (Blanes Decl. ¶¶ 39-41.)

### 6.  Plaintiff's 2003 Performance Evaluation

In July of 2003, Blanes gave Plaintiff his annual
performance evaluation, with an overall evaluation of "fully
successful" and a numerical score of 3.6 out of a possible 5.
(Blanes Decl. Ex. G.)  This review was slightly lower in certain
areas than Plaintiff's 2002 evaluation, but was higher in other
areas. (Blanes Decl. ¶ 108.)  Blanes also awarded Harley a
"Special Act Award" in 2003 for work on a project in which all
members of the Suspicious Activities Report ("SAR") project were
given an award.  (Blanes Decl. ¶ 111); (Harley Aff. ¶¶ 111-112.)
Plaintiff claimed that the evaluation was unfairly low, to which
Blanes responded with objective examples of business reasons for
the performance evaluation.  (Blanes Decl. ¶¶ 101-103.)  Earlier
in 2003, Blanes had not invited Plaintiff to attend a monthly
meeting for the SAR team.  (Harley Aff. at ¶ 108.)  Blanes

8

mentioned Harley's absence from these meetings in his 2003 evaluation, but did not penalize Plaintiff for the absence, and stated that he would begin inviting him to the meetings thereafter.  (Blanes Decl. ¶ 107.)  On October 9, 2003, Plaintiff filed EEO Complaint 04-3009, in which he claimed that Blanes's evaluation was kept low in retaliation for Plaintiff's November 2002 EEO complaint. (EEO Compl. 04-3009.)

### 7.    Plaintiff's 2004 Performance Evaluation

On October 5, 2003, William Fredrick became Plaintiff's new supervisor upon the retirement of Leo Blanes. (Fredrick Decl. ¶ 4.)  Fredrick met with Plaintiff on multiple occasions to provide feedback on how to improve his subsequent annual evaluation. (Fredrick Decl. ¶¶ 10-25.)  On August 3, 2004, Fredrick sent Plaintiff his 2004 evaluation, which included an overall rating of "exceeds fully successful" and a numerical score of 3.8 out of a possible 5. (Fredrick Decl. Ex. L).  Fredrick also recommended Plaintiff for a "Manager's Award" for his work on a particular assignment during the year, which he later received. (Fredrick Decl. ¶ 44 & Ex. M.)  However, Plaintiff's review was not high enough to qualify for a "Performance Award," which carried a higher prize value than the Manager's Award. (Harley Aff. ¶ 146.)

Plaintiff complained about the evaluation and elevated his concerns to the field office managers, who considered the review independently and concurred with Fredrick's evaluation. (Fredrick

Decl. ¶¶ 50-51.)  Plaintiff later sent an e-mail to Fredrick and
the field office managers complaining of discrimination and
retaliation, and requested six weeks off to recover from stress-
related ailments. (Fredrick Decl. ¶¶ 52-53.)  Fredrick sent
Plaintiff an e-mail tentatively approving the requested leave,
and instructing Plaintiff of the department's policy on extended
medical leave and the necessary medical documentation for
approval, which included a statement that going on extended leave
without providing the necessary documentation could result in
being considered AWOL. (Fredrick Decl. Ex. T).  Plaintiff
responded that the e-mail made him feel threatened and retaliated
against. (Fredrick Decl. ¶¶ 59-60).  Plaintiff's leave request
was eventually approved without the imposition of any discipline
or AWOL. (Fredrick Decl. ¶¶ 67-68).

On November 2, 2004, Plaintiff filed EEO Complaint 05-2093,
which alleged that Plaintiff's 2004 performance evaluation was
kept unfairly low due to racial discrimination and retaliation
for past EEO activity. (EEO Compl. 05-2093.)

### 8.  Plaintiff's 2005 Performance Evaluation

In January of 2005, John Tafur became Plaintiff's
supervisor. (Tafur Decl. ¶ 3.)  Harley returned from his extended
leave on February 18, 2005. (Tafur Decl. ¶ 10.)  On August 4,
2005, Tafur presented Plaintiff with his 2005 performance
evaluation, which included an overall rating of "exceeds fully

10

successful" and a numerical score of 3.8 out of a possible 5.
(Tafur Decl. Ex. A.)  Plaintiff responded that he was unhappy
with the evaluation and requested an in-person meeting, to which
Tafur agreed.  (Harley Aff. ¶ 188.)  At the meeting, Harley
argued, among other things, that one segment of his evaluation
included an inaccurate description of his assigned duties, which
convinced Tafur to raise that element, causing Plaintiff's
revised 2005 evaluation to show a numerical score of 4.0 out of a
possible 5. (Tafur Decl. ¶ 20).  Plaintiff later filed EEO
complaint 06-2127 (December 13, 2005), alleging that the
performance review was unfairly low so as to keep him from
receiving a performance award, because of racial discrimination
and in retaliation for his 2004 EEO complaint.

### 9. Plaintiff's Promotion to GS-12

During the summer of 2005, the field office management
decided to create a GS-12 Investigative Analyst position in the
Newark Field Office, which Plaintiff had been requesting for
years. (Auer Decl. ¶ 3); (Harley Aff. ¶ 245.)  Assistant Special
Agent in Charge ("ASAC") Daniel Auer, Special Agent in Charge
("SAC") Patricia Haynes and Acting SAC Bill Offord discussed the
matter after Plaintiff alerted them to the fact that the same
position had been created in the New York field office. (Auer
Decl. ¶ 4.)  The position was ultimately authorized by Director
of Field Operations John Imhoff.  Auer, Haynes and Offord all

agreed, once the position was authorized, that it should be located in the Springfield office because they believed the position, as a senior investigative analyst, would have greater interaction with (and require close proximity to) the U.S. Attorney's Office and field office management in Newark. (Auer Decl. ¶ 6.)

In August of 2005, shortly after the GS-12 IA position was announced, Plaintiff's colleague, IA Asfalg had scheduled a meeting with field office management to discuss a personal matter. (Scott Decl. ¶ 11-12.)  Plaintiff coincidentally called her immediately after she returned from the meeting, which Plaintiff believed was secretly about the GS-12 position, to ask her what she knew about the position.  (EEO Compl. 06-122F, Pl.'s Brief in Opposition at 17.)  The timing and topic of his call caused Asfalg to believe that Plaintiff was suspicious that the meeting was secretly about helping Asfalg gain the GS-12 position; she reported his call to her supervisor, James Scott. (Scott Decl. ¶ 13.)  Scott thought the call sounded inappropriate, and asked one or two of Plaintiff's co-workers who had informed him about the meeting.  (Id.)  Ultimately, no one was reprimanded or disciplined over the incident.  (Scott Decl. ¶ 14.)

In the fall of 2005, Plaintiff's then-supervisor, John Tafur, helped Plaintiff prepare for his interview for the GS-12

position by reviewing his accomplishments and conducting a mock interview. (Tafur Decl. ¶ 22.)  Plaintiff asked Tafur to inquire into whether the position needed to be located in Springfield. (Tafur Decl. ¶ 23.)  Both Plaintiff and IA Asfalg applied for the position, as the only two GS-11 IAs in the Newark Field Office. (Scott Decl. ¶ 15.)  Plaintiff was selected by the interview panel, and was officially offered the position on January 24, 2006 by Acting SAC Bill Offord.  (Tafur Decl. ¶ 24.)

### 10.  Plaintiff Moves to Springfield

Friday, February 3, 2006, was Plaintiff's last day as a GS-11 in Cherry Hill. (Scott Decl. ¶ 16.)  On that afternoon, Scott, who would become Plaintiff's supervisor in Springfield, contacted Plaintiff to arrange an arrival time in Springfield on Monday morning.  (Scott Decl. ¶ 17.)  Plaintiff hurt his back while packing and lifting boxes on Friday evening.  (Harley Aff. ¶ 194.)  Plaintiff did not tell anyone about this injury or act in a way that indicated that he had been injured.  (Scott Decl. ¶ 29 & Ex. B).

On Plaintiff's first day in Springfield, he arrived later than his normally scheduled arrival time, but had previously informed Scott of this arrangement.  (Harley Aff. ¶ 205.)  Scott denies having made this prior arrangement and told Plaintiff that he would charge him one hour for his lateness; he later confirmed that Plaintiff was late because of moving logistics, and decided

to not charge him for the lateness.  (Scott Decl. ¶¶ 18-20.)
Plaintiff insisted on being charged the hour, not wanting Scott
to think he had done Plaintiff a favor.  (Harley Aff. ¶ 208.)

       Later that week, Plaintiff requested that Scott fill out
some forms for a worker's compensation claim related to his back
injury. (<u>Id.</u> ¶ 213.)  Scott was unaware of any back injury, and
asked around to see if anyone else knew about the injury.  (Scott
Decl. ¶ 27.)  No one could confirm that Plaintiff had been
injured, because Plaintiff had not told anyone about it. (Harley
Aff. ¶ 215.)  In the course of Scott's inquiries, he heard about
other statements Plaintiff had made to co-workers on his first
day in Springfield that led him to suspect Plaintiff's back
injury was part of a ploy to get out of working in the
Springfield office.[3]  (Scott Decl. ¶¶ 30-31.)  This led him to
discuss his suspicions with his supervisors, Offord and Auer, who
concluded that the matter should be reported to the Treasury
Inspector General for Tax Administration ("TIGTA") for
investigation into possible workers compensation fraud.  (Scott
Decl. ¶¶ 48-50.)  During the course of this investigation,

_____

       [3] As Defendant points out in his Reply brief (Def.'s Reply
Br. at 20-21), Plaintiff confusingly cites to an incorrect page
in the record and distorts the substance of the evidence in this
area, in an apparent effort to mislead the Court into thinking
that one of these witnesses later denied making such a statement,
when the witness, in fact, made no such denial.  (<u>See</u>, Pl.'s R.
56.1 Stmnt. ¶ 274; Montanez Dep. 129:3-131:7.)  The Court reminds
Counsel for Plaintiff of the obligations to the Court under Fed.
R. Civ. P. 11.

Plaintiff's co-workers and medical providers were approached
about Defendant's suspicions of Plaintiff, which Plaintiff
believes hurt his professional reputation.  (Harley Aff. ¶ 228.)
Ultimately, no disciplinary action was taken, or wrongdoing
found, in the course of the TIGTA investigation.  (Id.); (Scott
Decl. ¶ 51.)

Plaintiff's time in Springfield working under Scott was
marked by discord in other ways.  Scott requested that Plaintiff
file paperwork for a particular kind of database inquiry, in the
same way that he requested of other employees who support Special
Analyst investigations. (Scott Decl. ¶¶ 66-69.)  Plaintiff
objected to the practice, as he felt that it could potentially
leave him vulnerable to charges of wrongdoing if one of the
requests was improper, which he felt he was personally unable to
properly verify.  (Harley Aff. ¶ 240.)

On March 14, 2006, Plaintiff went out on an indefinite leave
due to his back injury.  (Pl.'s R. 56.1 Stmnt. ¶ 290.)  Some time
thereafter, Plaintiff requested Scott assign him to the Mays
Landing office so that he could meet his physician's requirement
to not drive longer than 30 minutes at a time, as a reasonable
accommodation for his injury.  (Auer Decl. ¶ 20); (Harley Aff. ¶
229.)  Scott denied the request for a transfer to Mays Landing,
but offered instead a temporary posting (with the same pay) in
Philadelphia, which was closer both according to MapQuest and

15

according to personal tests done by ASAC Auer.  (Auer Decl. ¶ 21)
Plaintiff declined the offer of the Philadelphia temporary post,
explaining that the rush-hour traffic in and out of Philadelphia
would make the commute worse, even if the distance was shorter;
shortly thereafter, Plaintiff submitted a new doctor's note
permitting him to drive up to 35 to 40 minutes at a time.
(Harley Aff. ¶ 250); (Auer Decl. ¶ 24.)

On June 13, 2006, Plaintiff filed EEO Complaint 06-122F,
which alleged acts of retaliation against him by Auer, Offord and
Scott, including the "secret meeting" investigation, the
placement of the GS-12 position in Springfield, the TIGTA
investigation, the various difficulties with taking leave,
preference for Asfalg, and Scott's database paperwork requests.
(EEO Compl. 06-122F, Pl.'s Br. in Opp'n at 17-18.)

On October 4, 2006, while still out on leave, Plaintiff
filed EEO Complaint 06-776F, which alleged that the denial of a
temporary post of duty in Mays Landing was done in retaliation
for his prior EEO activities.

B.   Procedural History of the Present Action

On July 31, 2007, Plaintiff filed the instant action after
having exhausted his six administrative claims, claiming causes
of action under the New Jersey Law against Discrimination, the
First Amendment to the United States Constitution, the New Jersey
Constitution, and Title VII of the Civil Rights Act of 1964.

16

(Compl. at 11-18.)  Defendant moved to dismiss and for summary judgment in lieu of answer. [Docket Item 7.]  On December 9, 2008, this Court granted in part and denied in part Defendant's motion, dismissing all but the Title VII claim. [Docket Items 18 & 19.]  The Court held that Plaintiff had sufficiently alleged a cause of action under Title VII for racial discrimination and for retaliation, and that summary judgment on those claims was premature because Plaintiff had not yet had an opportunity to conduct discovery for facts that would support his claims. (Dec. 9, 2008 Op. at 15-16.)  Thereafter, Defendant answered Plaintiff's complaint [Docket Item 21], and the parties conducted extensive discovery.  On May 10, 2010, Defendant filed the present motion for summary judgment. [Docket Item 54.]

    C.   Listing Plaintiff's Title VII Claims

    The parties appear to disagree over what specific acts the Defendant has taken that constitute viable Title VII claims. Defendant argues that Plaintiff's claims should be limited to the specific factual allegations in his EEO complaints, not mere "generalized claims of discrimination and retaliation." (Def.'s Reply Br. in Supp. Summ. J. at 3.)  Plaintiff, by contrast, contends that "the scope of this civil action encompasses anything which can reasonably be expected to grow out of the EEO charges" (Pl.'s Br. in Opp'n at 23) and that "the Court must analyze Plaintiff's claims in their entirety." (Id. at 24.)

17

Plaintiff points to Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006)
(overruled in part on other grounds, Burlington N. & Santa Fe Ry.
Co. v. White, 548 U.S. 53, 68 (2006)) for the proposition that
the Court should treat every act identified by Plaintiff as all
connected in a single, "overall scenario" of retaliation. (Pl.'s
Br. in Opposition at 45).

    To the extent that the Plaintiff is simply asking the Court
to consider the specific allegations in the Complaint in addition
to the claims specified in Plaintiff's six EEO complaints that
predated it, the Court will consider all such claims. Ostapowicz
v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976) ("the
parameters of the civil action in the district court are defined
by the scope of the EEOC investigation which can reasonably be
expected to grow out of the charge of discrimination, including
new acts which occurred during the pendency of proceedings before
the Commission.") (internal citations omitted). However, the
Court will decline Plaintiff's invitation to treat every
unrelated act by different individuals spread over an eleven-year
period as a unified "overall scenario." Because Plaintiff can
not point to circumstances, like those found in Jensen, where
Defendant's acts are explicitly retaliatory or consistent and
repetitive in a way that creates an ongoing hostile work
environment, the Court will require Plaintiff to meet his burden
of pointing to evidence of all prima facie elements for each

discrete act of retaliation or discrimination.

The Court, reading the complaint and EEO documents generously in Plaintiff's favor, has identified the following fifteen allegations[4] which meet this standard in Plaintiff's complaint and EEO complaints:

> 1. Plaintiff alleges that Defendant retaliated against him in 1996 by inserting the remark that his new GS-11 position had no promotion potential, and that it was given to him as a result of a district court settlement. (Compl. at ¶¶ 4, 6-7). The consequence of this act of retaliation, Plaintiff alleges, was a delay in promotion to GS-12 (by denying him what would otherwise have been a career-ladder promotion) and "unfair" evaluations for upwards of ten years.  (Id. at ¶ 9.) (Harley Aff. at ¶¶ 252-267.)

> 2. Plaintiff alleges that Defendant retaliated against him in 1996 by transferring him to the Cherry Hill office, where he suffered hostility from his co-workers.  (Compl. ¶ 8.)

> 3. Plaintiff alleges that Defendant exposed him to a hostile work environment in the Cherry Hill office from 1996 to 1998.  (Id.)

> 4. Plaintiff alleges that Defendant retaliated against him for his 1994 and 1997 civil actions and for his subsequent EEO complaints by unfairly evaluating him in 2002, 2003, 2004, and 2005. (EEO Compl. 03-3040) (Compl. ¶¶ 11, 15).  The

---

[4] Plaintiff's EEO complaints also contain several other laments of Defendant's treatment of Plaintiff, such as Scott's inquiry into Plaintiff's calling Asfalg after her personal meeting with management in August of 2005, Scott's request that Plaintiff fill out various paperwork forms in March of 2006, and Offord's apparent disappointment at Plaintiff's acceptance of the GS-12 position in January of 2006. (See EEO Compl. 06-122F.)  As these claims contain no allegation that these acts were either retaliatory or discriminatory, they do not appear to state a claim under Title VII and the Court will not consider them.

consequence of these diminished evaluations was the loss of a performance award. (<u>Id</u>. ¶ 17.)

5.    Plaintiff alleges that Defendant retaliated against him for his prior district court lawsuits by delaying his promotion to GS-12 for several years. (EEO Compl. 03-3040.)

6.    Plaintiff alleges that Defendant retaliated against him for his complaints about his 2002 evaluation by "launching an attack" against him (accusing him of insubordination, e.g.) in August of 2002. (Compl. ¶ 12.)

7.    Plaintiff alleges that Defendant retaliated against him for his complaints about his 2002 evaluation by denying POV reimbursement to him in September of 2002. (<u>Id.</u> ¶¶ 13-14.)

8.    Plaintiff alleges that Defendant racially discriminated against him by denying POV reimbursement to him in September of 2002 but not denying such reimbursement to white co-workers. (<u>Id.</u> ¶ 14.)

9.    Plaintiff alleges that Defendant retaliated against him for his 2002 EEO complaint by denying his request for overtime and/or credit hours in December of 2002. (Pl.'s Br. at 21.)

10.   Plaintiff alleges that Defendant retaliated against him for filing the 2002 EEO complaint by "preclud[ing] Plaintiff from the opportunity to participate in some of the day-to-day operation related to the SAR review team" and then "penaliz[ing]" Plaintiff for that restriction. (<u>Id.</u> ¶ 15.)

11.   Plaintiff alleges that Defendant subjected him to a hostile work environment when his supervisor required medical documentation before approving extended medical leave, threatening him with AWOL if he did not comply. (Pl.'s Br. at 21)

12.   Plaintiff alleges that Defendant racially discriminated against him by evaluating him more harshly than his white colleague, resulting in an

unfairly low annual evaluation for the years 2002, 2003, 2004, and 2005.  (Compl. ¶¶ 11, 16-17.)  The consequence of these lowered evaluations was continued delayed promotion and denial of performance awards.  (Id. ¶ 17.)

13.   Plaintiff alleges that Defendant retaliated against him for his prior EEO activity by denying his request for a temporary post of duty transfer to a closer office of his choice in 2006.  (Id. ¶ 18.)

14.   Plaintiff alleges that Defendant racially discriminated against him by denying his request for a temporary post of duty transfer to a closer office of his choice in 2006, while allowing similar accommodations to white colleagues. (Id.)

15.   Plaintiff alleges that Defendant retaliated against him for his prior EEO activity by reporting him to TIGTA for investigation into possible worker's compensation fraud.  (Id. ¶ 19.)

Plaintiff's allegations fall into three categories of claims against Defendant: claims of a hostile work environment, claims of racial discrimination, and claims of retaliation.  The Court will evaluate each of these claims to determine whether Plaintiff has met his burden to survive summary judgment.

## II.  Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." United States v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).

**III. DISCUSSION**

    A.   <u>Hostile Work Environment and Racial Discrimination</u>

    Defendant argues that by not responding to Defendant's argument for summary judgment of his hostile work environment and racial discrimination claims in his opposition to summary judgment, Plaintiff has conceded the issues to Defendant. (Def.'s Reply Br. at 4.)  The Court is not persuaded by the non-controlling authority cited by Defendant to support this proposition.  <u>See</u> <u>Aurelio v. Bd. of Educ. of the Borough of Carteret</u>, No. 06-3146, slip op, 2009 WL 1794800 (D.N.J. June 23, 2009).  Instead, the Court reasons that if Rule 56 only permits the Court to grant summary judgment "if appropriate." Fed. R. Civ. P. 56(e), the Court has an independent obligation to determine whether summary judgment is appropriate on any particular point.  <u>See also</u> <u>Anchorage Associates v. Virgin Islands Bd. of Tax Review</u>, 922 F.2d 168, 175 (3d Cir. 1990) ("this does not mean that a moving party is automatically entitled to summary judgment if the opposing party does not respond") (internal citation omitted).

    Upon an independent review of the record, however, the Court is persuaded that summary judgment is "appropriate" for both Plaintiff's hostile work environment and racial discrimination claims because, upon the facts of record, he cannot meet his initial prima facie burden, as now explained.

### 1.   Hostile Work Environment

First, the Court concludes that Plaintiff fails to meet his initial burden of establishing a prima facie case of hostile work environment.  Plaintiff alleges two separate hostile work environments to which he claims to have been subjected.  The first is the Cherry Hill office from 1996 to 1998, in which Plaintiff has stated that he was "stared down" and "glared at" in an "intimidating manner."  (EEO Compl. 03-3040 at 2.)  The second hostile work environment Plaintiff has alleged is the pair of e-mails Fredrick sent to Plaintiff in 2004 in which Fredrick stated that if Plaintiff were to go on leave without complying with the stated medical documentation, he could be disciplined with AWOL. (Fredrick Decl. ¶¶ 59-60.)

To prevail upon a hostile work environment claim against an employer, a plaintiff must establish:

> (1) the employee suffered intentional discrimination because of his race or protected activity; (2) the discrimination was severe, pervasive, or regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) the basis for employer (respondeat superior) liability is present.

See Hudson v. Procter & Gamble Paper Products Corp, 568 F.3d 100, 104 (3d Cir. 2009); Jensen v. Potter, 435 F.3d 444, 499 (3d Cir. 2006).  Plaintiff can point to no evidence supporting several of these elements for either of his hostile work environment claims. In particular, the Court notes that Plaintiff has no evidence of

the second, third or fourth elements.  For the 1996-1998 claim,
Plaintiff has introduced no evidence attesting to either the
severity/regularity of his co-worker's glares, nor any evidence
from which a reasonable fact finder could conclude that Plaintiff
was detrimentally affected by the glaring.  See Oncale v.
Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998) (to be
hostile work environment, workplace must be "permeated with
discriminatory intimidation, ridicule, and insult that is
sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment.")
Similarly with the 2004 AWOL "threat," two e-mails from a
supervisor does not constitute severe, pervasive or regular, nor
does Plaintiff include any evidence on which a reasonable
factfinder could conclude Plaintiff was detrimentally affected,
much less a reasonable person in like circumstances.  His leave
was approved and no discipline was taken against him.  The Court
will consequently grant summary judgment as to Plaintiff's
hostile work environment claims.

### 2.  Racial Discrimination

The Court likewise concludes that Plaintiff's racial
discrimination claims do not survive summary judgment.  Plaintiff
alleges that his annual performance evaluations were artificially
lowered due to racial discrimination by his supervisors, and his
requests for POV reimbursement in 2002 and a temporary post of

25

duty transfer in 2006 were denied due to racial animus.

Plaintiff points to only indirect evidence of discrimination,

through comparison to the treatment given to his white

colleagues.

Regarding racial discrimination claims, Title VII provides,

in pertinent part:

> It shall be an unlawful employment practice for an employer
> to ... discriminate against any individual with respect to
> his compensation, terms, conditions, or privileges of
> employment, because of such individual's race....

42 U.S.C. § 2000e-2(a)(1).

Courts employ the burden-shifting framework of McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1972), to determine whether

a plaintiff alleging indirect racial discrimination under Title

VII will survive summary judgment.  See O'Connor v. Consolidated

Coin Caterers Corp., 517 U.S. 308, 310-11 (1996).  This framework

establishes a three-step process in which first the plaintiff

must establish a prima facie case of racial discrimination, which

creates a presumption of discrimination.  Then the defendant has

the opportunity to dispel this presumption by coming forward with

evidence of a legitimate, nondiscriminatory explanation for its

action.  Finally the plaintiff then must demonstrate that a

disputed issue of material fact exists under which a reasonable

factfinder could conclude that defendant's neutral explanation is

a pretext.  Id.

26

To meet the initial burden of establishing a prima facie case of racial discrimination, Plaintiff must point to evidence in the record that shows (1) membership in a protected group, (2) qualification for the position plaintiff seeks to attain or retain, (3) an adverse employment action, and (4) circumstances supporting an inference of discrimination. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); Risk v. Burgettstown Borough, 364 Fed. Appx. 725, 729 (3d Cir. 2010).

(a) Performance evaluations

Defendant argues that, for the "low" performance evaluations, Plaintiff fails to meet his initial burden because he cannot show that generally positive evaluations of "fully successful" or "exceeds fully successful" constitute an "adverse employment action" under the third element. (Def.'s Br. in Supp. at 21.) The Court is persuaded by the reasoning in Foster v. Ashcroft, Civil No. 05-1734, 2006 WL 1995305 at *2 (D.N.J. July 14, 2006), which held that even a negative performance evaluation could not constitute an adverse employment action unless it "tangibly alter[s] the terms and conditions of employment" such as resulting in "ineligibility for an automatic step salary increase" or a "non-discretionary salary increase." See also Tucker v. Merck & Co., Inc., Civil No. 03-5015, 2004 WL 1368823 at *13 (E.D. Pa. June 17, 2004) (finding no adverse employment action because employee plaintiff could not show that a better

27

evaluation would have "automatically" entitled him to more benefits).

Plaintiff alleges that his reduced performance evaluations impaired his employment conditions in two ways. First, Plaintiff argues that the sub-outstanding evaluations reduced his chances at getting, or delayed, his promotion to GS-12. (Harley Aff. ¶ 148.) Plaintiff argues that the promotion to GS-12 should have been a career-ladder promotion that would have been automatic upon satisfaction of minimal qualifications mostly involving time in rank and satisfactory performance evaluations; as evidence, Plaintiff cites to an IRS union agreement document. (Pl.'s Br. in Opp'n at 29); (Ex. U to Pl.'s Br. in Opp'n.) Plaintiff cannot, however, cite to any record evidence establishing that his particular GS-11 IA position was a career-ladder position. Indeed, the facts of the case indicate that not only was Plaintiff's job not eligible for career-ladder promotions to the GS-12 position, but the only other GS-11 IA in the Newark Field Office, Asfalg, must not have been eligible for a career-ladder promotion either, as the record demonstrates that she occupied the GS-11 position for at least four years (from 2002 to 2006) and was in competition with Plaintiff for the competitive GS-12 promotion in January of 2006, rather than being promoted to GS-12

non-competitively.[5]  Thus, Plaintiff points to no evidence
demonstrating that his performance evaluations kept him from any
automatic promotions or salary increases.

Plaintiff also argues that his sub-outstanding performance
evaluations barred him from receiving performance awards, which
he claims provide all employees with certain performance
evaluation scores with a monetary bonus.  (Harley Aff. ¶ 148.)
Plaintiff does not testify to what that necessary performance
level threshold was for any given year, however.  Indeed,
Defendant offers uncontested testimony that the requisite
performance score needed for a performance award changed from
year to year, and was not set by field office management until
after all the employee performance evaluations were written by
the first-level supervisors. (Blanes Decl. ¶ 112.)  Thus,
Plaintiff can point to no performance evaluation level at which a
performance award would have been automatic, as required to
qualify as an adverse employment action. Because Plaintiff cannot
present a prima facie case, the Court will enter summary judgment
on this claim.

---

[5] The Court notes another fact that Plaintiff misstates in
his brief.  See Pl.'s Br. in Opp'n at 30, "Asfalg was promoted to
a GS-12 IA grade level within one year of her having been
promoted to the GS-11 IA grade level.  This fact in itself
strengthens Harley's position that the GS-12 grade level should
have been a Career Ladder promotion."

(b)   <u>Denying Plaintiff's POV reimbursement</u>

The Court is likewise convinced that Plaintiff does not meet his burden of showing an adverse employment action when Blanes denied him reimbursement for the use of his POV on one occasion. The action in question simply is too trivial to qualify as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 749 (1998).  The Court is also persuaded by the cases cited by Defendant arguing that the loss of the use of a company car does not qualify as an adverse employment action under Title VII.  <u>See, e.g.</u>, <u>Roney v. Illinois Dep't of Transp.</u>, 474 F.3d 455, 461 (7th Cir. 2007).  Consequently, the Court concludes that Plaintiff has failed to make a prima facie case that Blanes's one-time denial of POV reimbursement constituted racial discrimination prohibited by Title VII.

(c)   <u>Denying Plaintiff's request for temporary
post of duty in Mays Landing</u>

Finally, the Court concludes that, as with the performance evaluations and the POV reimbursement, Plaintiff cannot make a prima facie case for discrimination based on Scott's denial of Plaintiff's request for a temporary post of duty in Mays Landing as a reasonable accommodation to his back injury.  The alleged discriminatory conduct is simply not actionable as racial discrimination under Title VII because it does not rise to the

level of adverse employment action.  Plaintiff was offered an accommodation that met the requirements of his doctor's instructions (the Philadelphia post of duty), and neither Plaintiff's preference for the Mays Landing office over Philadelphia nor speculation that heavier traffic into Philadelphia might be marginally more uncomfortable meets the adverse employment action threshold articulated in <u>Burlington Industries</u>, 524 U.S. at 749.

The Court therefore holds that summary judgment should be granted over Plaintiff's racial discrimination claims, leaving only Plaintiff's retaliation claims remaining.

B.   <u>Retaliation Claims</u>

The bulk of Plaintiff's claims fit within the category of Title VII retaliation.  The Court will, consequently, lay out the analytical framework for assessing the claims before examining the factual basis of the claims at each step.

**1.    Retaliation Claims Framework**

Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees
> ... because he has opposed any practice made an
> unlawful employment practice by this subchapter, or
> because he has made a charge, testified, assisted, or
> participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

As with racial discrimination, when addressing a motion for

31

summary judgment on a retaliation claim, the Court employs the
McDonnell Douglas framework.  See Moore v. City of Philadelphia,
461 F.3d 331, 342 (3d Cir. 2006) (applying McDonnell Douglas
framework in retaliation case).  To establish a prima facie case
for discriminatory retaliation under Title VII, a plaintiff must
demonstrate "(1) [plaintiff] engaged in an activity protected by
Title VII; (2) the employer took an adverse employment action
against [him]; and (3) there was a causal connection between
[his] participation in the protected activity and the adverse
employment action."  Id. at 349.

As explained supra the establishment of a prima facie case
gives rise to a presumption that the employer unlawfully
retaliated against the plaintiff.  Id. at 342.

         2.   **Prima Facie Case**

              (a)  Title VII-protected activity

With regard to the first element of Plaintiff's prima facie
case, the Court of Appeals has explained that "the anti-
retaliation provision of Title VII protects those who participate
in certain Title VII proceedings (the 'participation clause') and
those who oppose discrimination made unlawful by Title VII (the
'opposition clause')."  Moore, 461 F.3d at 341.  The Court
concludes that all six of Plaintiff's EEO complaints are
protected activity.  Additionally, the Court also identifies as
protected activity his district court lawsuits in 1994 and 1997,

32

and his complaints to supervisors that his evaluations were either retaliatory or racially motivated.  To the extent that Plaintiff can prove that Defendants took retaliatory adverse action that can be causally linked to any of these activities, such retaliation would be actionable under Title VII.

(b)  Materially adverse action

Regarding the second element of Plaintiff's prima facie case, a materially adverse action, the Court of Appeals has applied Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), to retaliation claims as follows:

> [T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment ... the Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Moore, 461 F.3d at 341 (internal quotation marks and citations omitted).

The standard a plaintiff must meet in establishing a materially adverse action is widely recognized to be "lower for a retaliation claim than for a disparate treatment claim." Flynn v. New York State Div. of Parole, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009).  That is, a plaintiff need not establish that the action adversely affected the terms and conditions of his employment under the retaliation provision, as is required under

33

the racial discrimination provision, but must instead only show that the employer's actions could dissuade a reasonable employee from engaging in Title VII-protected conduct in order to satisfy this element.  See Burlington Northern, 548 U.S. at 70-71.

Nevertheless, "[i]n evaluating whether actions are materially adverse, [the Court] must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" Moore, 461 F.3d at 346 (quoting Burlington Northern, 548 U.S. at 68).  Thus, while complaints of "[i]ncreased scrutiny" and "reprimands about plaintiff's lateness," Flynn, 620 F. Supp. 2d 463, 494, would not, under most circumstances, rise to the level of materially adverse actions, courts have recognized that the imposition of disproportionately heavy discipline would satisfy the Burlington Northern standard. See Moore, 461 F.3d at 346.

(I)  Actions which rise to the level of<br/>material adversity

Applying this authority to the facts presented, the Court finds that only two of Plaintiff's retaliation claims can survive this standard.  These acts of the Defendant are ones that the Court finds would reasonably create a presumption of retaliation if Plaintiff can additionally prove the actions were causally

34

linked to protected conduct.

First, Blanes's exclusion of Plaintiff from the SAR review team meetings.  Though Plaintiff can not identify any evidence in the record that he was penalized for not attending the meetings, his exclusion closely approaches the "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement" identified in Burlington, 548 U.S. at 69.  See also Hare v. Potter, 220 Fed. Appx. 120, 129 (3d Cir. 2007) (being denied the opportunity to participate in a program which could enhance employee skills is materially adverse).  The act at the time, prior to his promotion, might have seemed like a significant restriction to a reasonable employee in Plaintiff's situation, and could potentially dissuade such an employee from future complaints if it were a consequence of engaging in protected activity.  The Court will return to this claim in the next element of causality.

Second, Defendant's decision to report Plaintiff to TIGTA for Workers Compensation also satisfies the materially adverse standard.  According to Moore, the "imposition of disproportionately heavy discipline" was recognized as rising to the level of materially adverse actions.  Moore, 461 F.3d at 346. While it is true that merely launching an investigation is not subjecting an employee to discipline, the investigation itself can and, in this case, did cause disruption and embarrassment to

35

an employee.  Defendant cites to other district courts that have

held that an investigation, absent discipline, is not materially

adverse.  See Ginger v. District of Columbia, 477 F. Supp. 2d 41,

53 (D.D.C. 2007) ("The mere initiation of an investigation into a

plaintiff's conduct is not an adverse employment action when it

has no effect on the plaintiff's employment").  Here, however,

Plaintiff has competently entered testimony into the record of

the fact that co-workers and medical providers were informed of

the fraud allegations and investigation, damaging Plaintiff's

professional reputation.  (Harley Aff. ¶ 228.)  The Court

concludes that, should Plaintiff be able to prove a causal link

between this act and any Title VII protected conduct, Plaintiff

will have established a prima facie case on this claim.

> (ii) Actions which do not rise to the level
> of material adversity or for which there is
> no admissible evidence

     First, the Court finds that Defendant's remark in

Plaintiff's SF-50 that the position has "no promotion potential"

is not materially adverse.[6]  Plaintiff can point to no evidence

that the remark has had any negative consequence on his

---

[6] The Court notes that it has already made this finding in a
prior lawsuit between these two parties.  See Harley v. Rubin,
Civil No. 97-4082, slip op. at 9-10 ("there is, in short, no
adverse action for this Court to review").  However, Defendant
does not raise a res judicata defense to this issue, and the
Court concludes independently, under the new Burlington Northern
standard of material adversity, that the remark still falls short
of the requirement.

advancement or promotion potential.  Indeed, the record appears
to indicate unequivocally that all GS-11 IAs in the Newark Field
Office effectively had "no promotion potential" and were obliged
to apply competitively for any further promotion beyond their
position.  The Court finds that a reasonable employee, upon
successfully settling a lawsuit with a promotion like the one
Plaintiff received, would not be dissuaded from engaging in
further Title VII activity as a result of the remark.  The
Plaintiff himself is living proof of that fact, having filed at
least seven EEO complaints and two lawsuits under Title VII since
first seeing his SF-50 form.  The Court consequently concludes,
again, that the SF-50 remark does not rise to the level of
material adversity required for Plaintiff to make a prima facie
case of retaliation on this claim.

Second, Plaintiff's claim that Defendant's assignment to
Cherry Hill was an act of retaliation flies in the face of the
facts surrounding the 1996 settlement.  As clearly documented on
the record and in this Court's order enforcing the settlement,
Plaintiff voluntarily accepted the post at Cherry Hill when he
accepted the settlement.  It was one of the terms of the
settlement.  See Harley v. Bentsen Civil No. 94-749.
Consequently, Plaintiff cannot demonstrate now that the
assignment was retaliatorily adverse.

Third, Plaintiff's claims that his performance evaluations

37

of "exceeds fully successful" or "fully successful" were
materially adverse.  These claims also fail for the same reasons
that Plaintiff failed to show that the evaluations were adverse
under the racial discrimination standard: positive reviews that
have no effect on salary or promotion are not an adversity of any
sort that is actionable under Title VII.  The Court is persuaded
by the Eighth and Tenth Circuits who have held on this issue that
a reasonable employee would not be dissuaded from engaging in
protected conduct by such a review.  See Sutherland v. Mo. Dep't
of Corr., 580 F.3d 748, 752 (8th Cir. 2009); Fox v. Nicholson,
304 Fed Appx. 728, 733 (10th Cir. 2008).  Indeed, to hold to the
contrary would mean that any employee could ensure a sterling
performance evaluation for herself simply by filing an EEO
complaint against her employer immediately prior to receiving her
annual review.

    Fourth, Plaintiff's claim that he was not promoted to GS-12
as early as he should have been fails to meet the material
adversity threshold.  Plaintiff alleges often throughout his
brief and factual statements that the IRS management could have
created a GS-12 position for him, but his allegations have no
support in the record.  The only admissible evidence on this
issue comes from Defendant's witness who explained the required
approvals to creating the GS-12 position. (Auer Decl. ¶¶ 3-7.)
Further, Plaintiff's assumption that Defendant owed him a

38

promotion in some way is without factual or legal support.  Thus, any claim that Defendant did not quickly create a GS-12 position for him to be promoted into must also fail.

Fifth, Plaintiff's claim that Blanes's August 2002 e-mail using the word "insubordinate" constituted retaliation similarly fails to meet the material adversity standard.  This level of inter-office bickering falls within the range of "petty slights" and "minor annoyances" regularly encountered in the workplace. Burlington Northern, 548 U.S. at 68.

Sixth, Blanes's refusal to grant POV reimbursement on one occasion in September of 2002 and denial of overtime or credit hours in December of 2002 cannot meet the Material Adversity standard, as it falls more on the "increased scrutiny" or "micromanaging" side of the scale not implicated in Title VII. See Ahern v. Shinseki, Civil No. 05-117, slip op, 2009 WL 1615402, at *5 (D.R.I. June 9, 2009).

Finally, seventh: Defendant's refusal to offer Plaintiff a temporary post of duty in Mays Landing again fails to meet the materially adverse threshold.  A reasonable employee would not be dissuaded from engaging in protected conduct because he was offered a temporary duty post in Philadelphia rather than Mays Landing, where the positions are roughly equidistant from his residence.  An employer's decision to not give an employee precisely what he wants does not automatically rise to the level

39

of materially adverse.

The Court thus concludes that only two retaliation claims (as found in Part III.B.2(b)(i) above) satisfy this requirement of Plaintiff's prima facie case.  Summary judgment will be granted for Defendant upon the other retaliation claims (as found herein in Part III.B.2(b)(ii)).  These remaining claims will thus be analyzed under the final element of a prima facie retaliation claim.

(c)  <u>Causal connection</u>

The final requirement for Plaintiff to make a prima facie case is "a causal connection between [Plaintiff's] participation in the protected activity and the adverse employment action." <u>Moore</u>, 461 F.3d at 340-41.  The Court of Appeals has recognized that a plaintiff can demonstrate causation in the Title VII retaliation context through a variety of means.  First, "[t]here have been cases in which the temporal relation between an adverse employment action and the protected activity has enabled the court to draw the inference of causal relationship," although "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unduly suggestive." <u>Cardenas v. Massey</u>, 269 F.3d 251, 264 (3d Cir. 2001) (internal quotations and citations omitted).  A two-day interval between the protected activity and the adverse conduct has been recognized as "unduly suggestive," <u>id.</u>, whereas

40

a three-month interval is usually not.  See Rogers v. Delaware,
Dept. of Public Safety/DMV, 541 F. Supp. 2d 623, 627 (D. Del.
2008).

Alternatively, where the timing itself is not unduly
suggestive, a plaintiff can satisfy the causation element by
producing evidence of "antagonism or retaliatory animus toward
plaintiff." Id. (citing Farrell v. Planters Lifesavers Co., 206
F.3d 271, 279-81 (3d Cir. 2000).  Finally, the Court of Appeals
has also recognized that the "evidence, looked at as a whole, may
suffice to raise the inference," where, for example, "the
employer gave inconsistent reasons for [the adverse action]."
Farrell, 206 F.3d at 280-81.

Because these two retaliation claims could reasonably be
considered materially adverse under the previous element, the
Court will consider these claims under the causality step.

(i) Exclusion from SAR team meetings

The Court first turns to Plaintiff's claim that Blanes
excluded Plaintiff from the SAR team meetings.  The Court is
unable to find cause based solely on temporal proximity to
protected activity because Plaintiff does not enter into the
record any evidence pointing to when the SAR monthly meetings
began and when Plaintiff might reasonably have been invited to
attend them.  Plaintiff's absence from the meetings was first
noted in the record before the Court in his July 2003 performance

41

evaluation.  While it seems likely that these meeting were taking place for months earlier, the Court declines to speculate on how much earlier.  The most recent protected activity in the record prior to July of 2003 is Plaintiff's November 2002 EEO complaint. Under Cardenas and Rogers, an eight-month gap between Title VII protected conduct and the materially adverse act is too long to be unduly suggestive.  541 F. Supp. 2d at 627.  As it is Plaintiff's burden to establish causation, the silence of the record on this point results in a finding of no suggestive temporal proximity to any protected conduct.

Additionally, Plaintiff points to no other evidence supporting an inference of a causal link between protected conduct and Plaintiff's exclusion from the meeting.  Even Plaintiff's December 2002 spat with Blanes regarding overtime would not count as an intervening act of animus under Farrell (as the encounter lacked any reference to the November 2002 EEO complaint, or any mention of "payback", etc.).  206 F.3d, 279-81. Further, even if the December disagreement over overtime could be considered an intervening act of antagonism, the gap of more than seven months between even this intervening act is insufficient to meet the causation requirement.

Even looking at all the facts as a whole, under Farrell, does not raise an inference of causation here. It was Defendant who brought to Plaintiff's attention his future attendance at the

meeting groups in the first place, indicating that it was not
raised in a manner designed to antagonize or connect with a
desire to retaliate for prior protected activity.  The Court thus
concludes that Plaintiff cannot show any causal link between
Plaintiff's exclusion from the SAR team meeting and any protected
activity.  Thus, Plaintiff does not carry his prima facie burden
with regard to this claim of retaliation, and the Court will
enter summary judgment in Defendant's favor on this point.

(ii) TIGTA investigation

The Court next turns to the Plaintiff's remaining Title VII
claim, which requires a showing of a causal connection between
Defendant's act of launching a TIGTA investigation into
Plaintiff's worker's comp request and any Title VII protected
activity.  As with the claim of exclusion from the SAR team
meeting, the Court can find no evidence in the record indicating
a causal connection here.

There does not appear to be a sufficiently suggestive time
connection to allow temporal proximity alone to satisfy the cause
requirement.  The record is again blank on the specific date that
Defendant launched the TIGTA investigation, but it could have
happened no sooner than when Plaintiff went out on extended leave
on March 15, 2006.  (See Auer Decl. ¶¶ 20-26) (establishing that
Auer and Offord did not decide to initiate the TIGTA
investigation until after Plaintiff had been out on leave and

43

requested an accommodation at a different post of duty.)  The most recent Title VII protected conduct prior to that date is Plaintiff's EEO complaint of December 12, 2005.  This gap of more than three months does not support a claim of unduly suggestive timing on its own.  <u>Rogers</u>, 541 F. Supp. 2d at 627.

Secondly, Plaintiff again cannot point to any intervening acts of antagonism between the protected conduct and the act. Plaintiff's ongoing difficulties with Scott regarding Plaintiff's leave time and morning arrival times do not constitute such acts of antagonism within the meaning of <u>Farrell</u>, as there is no indication that Scott was thinking about or made any reference to Plaintiff's EEO complaint in any of these encounters.  Moreover, there was no dispute but that Plaintiff was tardy reporting to work on these few occasions, and the disagreement (ultimately resolved in Plaintiff's favor) was whether his lateness was excusable due to logistics around Plaintiff's move to Springfield.

Finally, the "facts as a whole" analysis under <u>Farrell</u> again yields no inference of retaliation in this circumstance.  While it might be possible to infer that Auer and Scott were upset when they came to suspect that Plaintiff was defrauding the worker's compensation fund, that concern does not appear to have any connection to Plaintiff's prior protected activity of filing an EEO complaint. Given the facts of a substantial worker's

44

compensation request that was initially unsupported by medical evidence of a compensable event and condition, the decision to look further into Plaintiff's request was not so arbitrary or irrational that an inference of retaliation could be inferred.

Consequently, the Court concludes that Plaintiff cannot make a prima facie case on this claim.  As this claim was the final remaining claim in Plaintiff's action, the Court concludes that it must grant Defendant's motion for summary judgment and dismiss the action.

**IV.   CONCLUSION**

For the reasons set forth above, the Court will grant Defendant's motion for summary judgment.  The accompanying Order will be entered.


**September 29, 2010**                        **  /s Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              United States District Judge